IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

LARRY R. WIGGINS and
CAROLYN E. WIGGINS,

          Plaintiff,

v.                                          Case No. 2:14-cv-11103

JP MORGAN CHASE BANK, N.A.,
and SENECA TRUSTEES, INC.,

          Defendants.

**PROPOSED FINDINGS AND RECOMMENDATION**

This matter is before the court upon the removal of Civil Action No. 13-C-287 from the Circuit Court of Logan County, West Virginia.  This matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B).  Pending before the court are JP Morgan Chase Bank, N.A.'s Motion to Dismiss (ECF No. 3), Seneca Trustees, Inc.'s Motion to Dismiss (ECF No. 5), and the plaintiff's Motion for Summary Judgment (ECF No. 7-2).

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On November 5, 2005, the plaintiffs, Larry and Carolyn Wiggins, signed a promissory note in the amount of $50,000 ("Loan") with JP Morgan Chase Bank, N.A. ("Chase").  (ECF No. 3, Ex. A).  The Loan was secured by a Deed of Trust on the plaintiff's residence located at HC 74, Box 3063, Chapmanville, Logan County, West

Virginia.  (*Id.*, Ex. B).  Under the Deed of Trust, the plaintiffs are the grantors, Chase is the lender and beneficiary, and defendant Seneca Trustees, Inc. ("Seneca") is the substitute trustee.  (*Id.* at 1).  The promissory note (*id*, Ex. A at 1) and the Deed of Trust (*id.*, Ex. B at 4) both state that the grantors would be in default if they failed to make payments when due.  The Deed of Trust further enumerates the rights and remedies available to the lender and the trustee upon default, which includes the right to institute a foreclosure sale.  (*Id.*, Ex. B at 4).  The Deed of Trust also sets forth the powers and obligations of the trustee (*id.*, Ex. B at 4-5), in addition to those defined by statute in W. Va. Code § 38-1-1 *et seq.*

The plaintiffs ultimately defaulted on the Loan.  Consequently, Chase attempted to enforce its rights and pursue remedies under the terms of the Loan and Deed of Trust by instructing Seneca to institute foreclosure proceedings on the subject property.

Accordingly, on October 7, 2013, Seneca issued a Notice of Trustee's Sale ("Notice"), pursuant to the terms of the Deed of Trust and W. Va. Code § 38-1-4, setting a foreclosure sale on November 5, 2013.  The plaintiffs claim that they received the Notice on October 29, 2013.  On November 5, 2013, the plaintiffs filed a Complaint in the Circuit Court of Logan County ("Circuit Court") (Case No. 13-C-287), alleging breach of contract and fraud, and also filed a Motion for Emergency Stay to Prohibit Sale of Real Estate.  The foreclosure sale was voluntarily postponed.  Chase filed an Answer to the plaintiff's Complaint on November 27, 2013.  Seneca answered the Complaint on December 6, 2013.

During a status conference and hearing held on February 6, 2014, the Circuit Court granted the plaintiffs' oral motion to amend their Complaint based upon a document purported by the plaintiffs to be their Amended Complaint, which had been

2

filed in the Circuit Court on the previous day.  The Amended Complaint (ECF No. 1-2) largely asserts that the defendants have violated the plaintiffs' federal constitutional rights – citing to Article I, Section 10 of the United States Constitution, and to the Fourth, Fifth and Fourteenth Amendments thereto, which is the basis for the removal of the Circuit Court action to this court.

The Amended Complaint also contains allegations of fraud, anticipatory repudiation and other breach of contract-type allegations against Chase.  In relation to these claims, the plaintiff's Amended Complaint also references the Troubled Asset Relief Program ("TARP") and the Capital Purchase Plan ("CPP"), programs backed by the U.S. Treasury to assist American financial institutions who were facing financial crisis.  As described on the U.S. Treasury website, TARP was "established to help stabilize the U.S. financial system, restart economic growth, and prevent avoidable foreclosures."

(www.treasury.gov/initiatives/financial-stability/TARP-Programs/Pages/default.aspx).

The plaintiffs' Amended Complaint describes TARP as having been "designed to take bad mortgages off the books of financial institutions in America, and onto the books of the federal government."  (ECF No. 1-2 at 8).  The plaintiffs further assert that "[d]ue to the process, violation of the Fourth Amendment TARP was not available to us." (*Id.*)  The Amended Complaint further states:

> The Capital Purchase Program, hereinafter known as the (CPP) was launched to stabilize the financial system by providing capital to viable financial institutions of all sizes throughout the nation.  Without a viable banking system, lending to businesses and consumers could have froze [sic] [I]n addition, the financial crisis might have spiraled further out of control.  Due to Chase's
>
> 1.    high level of debt,
> 2.    evil, diabolical business practices,

3.      expanding embezzlement by bundling mortgages,
4.      working a scam income from mysterious debt instruments and
5.      where individual mortgages could be sold up to ten-times the amount.

(ECF No. 1-2 at 8).  The plaintiffs also assert that "less than 1% of the two-million seven hundred thousand families received TARP."  (*Id.* at 9).

The plaintiffs' allegations are extremely difficult to comprehend.  However, it appears that they are alleging that Chase embarked upon a scheme to enter into mortgage agreements and then bundle those mortgages and sell them off to third parties at a large profit, notwithstanding the fact that they had accepted the TARP and CPP funding, and while not agreeing to modify mortgages for borrowers, such as the plaintiffs, who found themselves in default (and who did not receive the benefit of TARP assistance), choosing instead to institute foreclosure proceedings.

Finally, the Amended Complaint summarily states that the plaintiffs would address a claim that defendant Seneca Trustees, Inc. violated the Fair Debt Collection Practices Act "in due course.  (ECF No. 1-2 at 2).  Thus, the Amended Complaint contains no specific allegations concerning that claim.

The defendants filed a Notice of Removal in this court on February 24, 2014.  (ECF No. 1).  On March 3, 2014, the defendants filed their respective Motions to Dismiss.  (ECF Nos. 3 and 5).  On March 27, 2014, the plaintiffs filed an Objection to Seneca's Motion to Dismiss (ECF No. 7-1) and filed their own Motion for Summary Judgment (ECF No. 7-2).  That same date, the plaintiffs also filed an Objection to Chase's Motion to Dismiss.  (ECF No. 9).  On April 2, 2014, Seneca filed a reply brief.  (ECF No. 12).  On April 3, 2014, Chase filed its reply brief.  (ECF No. 13).  On May 8,

2014, the plaintiffs, without leave of court, filed a Sur-Reply addressing Chase's Motion to Dismiss.  (ECF No. 17)

On April 9, 2014, Seneca filed a Response in Opposition to the plaintiff's Motion for Summary Judgment.  (ECF No. 15).  On May 8, 2014, the plaintiffs filed a Sur-Reply to Seneca's Motion to Dismiss and a Reply to Seneca's Response to their Motion for Summary Judgment.  (ECF No. 18).

## STANDARDS OF REVIEW

### *Motions to Dismiss for Failure to State a Claim*

Because the plaintiffs are proceeding *pro se*, the court is obliged to construe their pleadings liberally.  *Haines v. Kerner*, 404 U.S. 519, 521 (1972).  However, in *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007), the Supreme Court observed that a case should be dismissed for failure to state a claim upon which relief can be granted if, viewing the well-pleaded factual allegations in the complaint as true, and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."  While the complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  *Id.* at 555.  The Supreme Court elaborated on its holding in *Twombly* in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a civil rights case.  The Court wrote:

> Two working principles underlie our decision in *Twombly*.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  [*Twombly*, 550 U.S.] at 555, 127 S. Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted).  Rule 8 . . . does not unlock the doors of discovery for a plaintiff

armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Id.*, at 556.

* * *

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

556 U.S. at 678-79.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct."  *Id.* at 678.

### Motions for Summary Judgment

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a) (2010).  Material facts are those necessary to establish the elements of a party's cause of action.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  *Id.*  The moving party has the burden of establishing that there is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate

where the ultimate factual conclusions to be drawn are in dispute.  *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991).

Rule 56(c)(1) of the Federal Rules of Civil Procedure provides that:

A party asserting that a fact cannot be or is genuinely disputed, must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  Subsection (e) of Rule 56 provides that, if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the court may:  (1) give the parties an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and undisputed supporting materials show that the movant is entitled to it; or (4) issue any other appropriate order.  Fed. R. Civ. P. 56(e).

A court must not resolve disputed facts, weigh the evidence, or make determinations of credibility.  *See Sosebee v. Murphy*, 797 F.2d 179, 182 (4th Cir. 1986); *Russell v. Microdyne Corp.*, 65 F.3d 1229, 1239 (4th Cir. 1995).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  However, the

7

party opposing the motion may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Sprenkle v. Hartford Life Ins. Co.*, 84 F. Supp. 2d 751 (N.D. W. Va. 2000).

## ANALYSIS

### A.    Chase's Motion to Dismiss.

Chase's Motion to Dismiss (ECF No. 3) and Memorandum of Law in support thereof (ECF No. 4) contend that the plaintiff's federal constitutional claims fail as a matter of law because the defendants are not state actors.  Chase further asserts that the plaintiff's fraud claims are not pled with particularity, as required by Rule 9 of the Federal Rules of Civil Procedure.  Chase further asserts that the plaintiff's "TARP" and "CPP" counts must be dismissed because there is no legitimate private right of action created by these government programs, that these counts contain irrelevant factual allegations that do not specifically pertain to the plaintiffs or the mortgage at issue, and that any such claims are derivative of the plaintiff's fraud and constitutional claims, which also fail.  Finally, Chase asserts that the plaintiffs' "anticipatory repudiation" and other breach of contract-type claims are conclusory in nature and lack any factual support.  The undersigned will address each argument in turn.

#### *The plaintiff's federal constitutional claims*

Chase first asserts that the plaintiffs' federal constitutional claims lack merit because Chase is a private entity, not a government or state actor and, thus, the cited constitutional provisions are not applicable in this case.  Chase's Memorandum of Law specifically states:

> Though not crystal clear, it is gleaned from the Amended Complaint that Plaintiffs attempt to characterize Chase's private, contractual right of foreclosure and any actions taken in conjunction therewith as an

> unconstitutional seizure under the Fourth Amendment and an unconstitutional violation of the due process clauses of the Fifth and Fourteenth Amendments. However, none of these constitutional amendments are applicable in the case at bar, even assuming as true any and all factual allegations contained in the Amended Complaint.

(ECF No. 4 at 4).

> Title 42, Section 1983 of the United States Code provides as follows:

> Every person who, *under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia*, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 [Emphasis added].  Section 1983 is the vehicle upon which the plaintiffs must bring their federal constitutional claims.

Concerning the plaintiffs' Fourth Amendment claims, Chase's Memorandum of Law states:

> Here, Plaintiffs assert in their count labeled "Fourth Amendment Protection" that they "must be afforded some sort of legal notice, plus a judicial hearing, before *Chase* could simply enforce the contract." (Am. Compl., p. 4) (emphasis added).  Plaintiffs also generally reference the "'taking' of [their] property without due process of law" in the same paragraph. (*Id.*)  Critically, Plaintiffs fail to allege any action on the part of the government such that the Fourth Amendment would apply.  Rather, as emphasized above, their allegations solely speak to Chase, an indisputably private entity.  Nor does the Amended Complaint contain any allegations that a governmental entity knew of and acquiesced in Chase's alleged actions or that Chase intended to assist law enforcement in its alleged actions.  The alleged actions of Chase in the case at bar are entirely those of a private entity seeking to further its own ends, in accordance with its rights under the terms of the Deed of Trust and the Loan.  Accordingly, the Fourth Amendment is not applicable in this case.

(ECF No. 4 at 5).  Chase further asserts that the plaintiffs' "Exclusionary Rule" claim, which is derivative of their Fourth Amendment claim, and is not applicable in the civil context, also fails because the defendants are not state actors.  (*Id.* at 11).

Likewise, Chase asserts that there was no government action that could give rise to a claim under either the Fifth or Fourteenth Amendments:

> Here, Plaintiffs bring both Fifth and Fourteenth Amendment claims, yet they do not plead any action or involvement on the part of either the state or federal government in relation to the subject foreclosure.   Critically, under their count labeled "Fifth Amendment Protection," Plaintiffs assert "we have due process and that they *the banks, and corporations* cannot come in and take that which belongs to the people." (Am. Compl., p. 13) (emphasis added).  Indeed, if any coherent allegations can be extracted from either count, those allegations pertain solely to Chase and no other entity.

> As best gleaned from Plaintiffs' Amended Complaint, the offensive conduct is the foreclosure on their property and any actions taken in conjunction therewith by the lender, Chase, and/or the substitute trustee, Seneca, pursuant to the terms of the Deed of Trust and the Loan.  Courts have specifically held that such action – even where the lender is a private corporation wholly-owned by the federal government – does not constitute "government action" implicating the Fifth or Fourteenth Amendments. *See, e.g., Warren v. Government National Mortgage Association*, 611 F.2d 1229 (8th Cir. 1980) [in which the Eighth Circuit found that an extrajudicial foreclosure, without prior notice and hearing, pursuant to a deed of trust held by a private corporation that was wholly-owned by the federal government, did not involve government action that would give rise to Fifth Amendment due process protections].

(*Id.* at 6-8).

Finally, Chase asserts that the plaintiffs' claim under Article I, Section 10 of the United States Constitution (also known as the "Contract Clause") also fails because it "is expressly applicable to state action and does not reach private action." (*Id.* at 10). Chase further asserts that this claim is based upon a general legal conclusion that Chase delivered a "void" and "fraudulent" contract, which is not supported by any specific factual allegations that could give rise to a plausible claim under Section 10.  Chase's Memorandum of Law further states:

> In cases that present a close question, the United States Supreme Court has delineated a two-part approach to determine whether the given offensive conduct may be "fairly attributable to the State:"

10

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible . . . . Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.  This may be because he is a state official, because he has acted together with or obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

> *Lovell* [*v. Peoples Heritage Savings Bank*] 776 F. Supp. [578,] 581 [(D. Maine 1991)] (quoting *Lugar v. Edmundson Oil Co.*, 457 U.S. 922, 937 (1982)).

> * * * Applying then the two-part inquiry above, it is clear that Chase, in contracting with Plaintiffs: (1) was not exercising a right or privilege created by the State; and (2) was not a state actor, as it did not act together with or obtain significant aid from state officials, or engage in conduct otherwise chargeable to the State.

(ECF No. 4 at 10-11).

The plaintiffs' Objection to Chase's Motion to Dismiss (ECF No. 9) largely repeats the allegations made in their Amended Complaint concerning the alleged violations of their federal constitutional rights.  The plaintiffs assert that, because Chase engaged in this alleged "scheme to withdraw 700 billion dollars from circulation in the U.S. economy," the plaintiffs "suffered financial failure," and the attempted foreclosure on their property:  (1) deprived them "of the right to be secure in their person, houses, papers and effects," in violation of the Fourth Amendment (*id.* at 5); (2) deprived them "of life, liberty and property without due process of law" in violation of the Fifth and Fourteenth Amendments (*id.* at 5-6); and (3) violated their right to "equal protection" in violation of the Fourteenth Amendment (*id.* at 6).

The plaintiffs further assert that "Chase engaged in a deliberate plan whereby Chase had calculated the number(s) of mortgage borrowers to anticipate default," and

thus denied the plaintiffs "the basic right of obligation of contract under Article I, Section 10 of the U.S. Constitution." (*Id.* at 7). The plaintiffs further allege that "Chase saw to fix a mortgage and promissory note to be used in such a manner as fraud for the purpose of taking the Wiggin[s'] Property." (*Id.* at 5). Finally, the plaintiffs' Response clarifies that their "exclusionary rule" argument centers upon their request that their mortgage be canceled, that all documents related to their mortgage and their default therein be removed from their credit reports, and that their property be returned to them free and clear of any encumbrances. (*Id.* at 7).

Chase's Reply (ECF No. 13) asserts that the plaintiffs have completely ignored the controlling authority establishing that, because Chase was acting as a private entity, and not a government or state actor, during the course of the events giving rise to the instant civil action, the constitutional protections relied upon by the plaintiffs are not applicable, and Chase has no liability to the plaintiffs thereunder. Chase further asserts that the plaintiffs have misconstrued one or more of the constitutional provisions. Their Reply states:

> After quoting the Fourth Amendment, Plaintiffs conclude that they "have a right of the people to be secure in their person, houses, papers, and effects. This is a Constitutional Right for their mortgage and promissory note and it is not to be violated." (Pls.' Obj. at p. 5). However, the known thrust of the Fourth Amendment is to protect people from unreasonable **searches and seizures**, whether they may occur on their person or in their **houses**, papers or effects. [Emphasis in original] [Footnote omitted]. It is not a literal and unconditional right to a house (or a mortgage, especially where the complaining party has defaulted on the same).
>
> For the foregoing reasons, and for the reasons more fully discussed in Chase's Motion, Plaintiffs fail to state claims upon which relief can be granted under Article I, Section 10, the Fourth Amendment, the Fifth Amendment, the Fourteenth Amendment and the Exclusionary Rule.

(ECF No. 13 at 3).

As aptly noted by the defendants, neither Chase, nor Seneca, were "state actors" or "acting under color of state law" with respect to their roles in the plaintiff's entry into a mortgage agreement with Chase and the attempted foreclosure on their property. Rather, Chase and Seneca are private entities, and the sections of the United States Constitution cited by the plaintiffs do not give rise to a right of action under Section 1983 by the plaintiffs against these defendants. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted concerning the plaintiffs' claims alleged under Article I, Section 10 of the United States Constitution and under the Fourth, Fifth and Fourteenth Amendments.

### *The plaintiffs' allegations of fraud, breach of contract and anticipatory repudiation*

Chase's Memorandum of Law further contends that, while the plaintiffs have not explicitly alleged a count for fraud, the Amended Complaint contains allegations thereof throughout. Specifically, Chase notes the following allegations:

> Plaintiff is [sic] all the necessary elements of *fraud*, misrepresentation, by Chase.
> ...
> Chase was in fact deliberately working in a manner to deceive us, lie, literally into one of the most unbelievable, most diabolical, evil schemes of economic-*fraud*, misrepresentation ever perpetrated on to the People of the State of West Virginia and the American People.
> ...
> a *fraudulent* mortgage
> ...
> Plaintiffs are of the *belief that Chase committed fraud* . . . . The manner in which Chase committed fraud was first to violate the Fourth, Fifth and Fourteenth Amendments to the U.S. Constitution. Specifically, this was committed by Chase by a plan deliberately calculated by Chase to set the Wiggin's [sic] on a perilous path of financial ruin . . . [.]

(Am. Compl., pp. 5, 11-12, 15) (emphasis added) (as quoted in ECF No. 4 at 12).

Chase asserts that these allegations are "extremely general and conclusory, expressing nothing more than Plaintiffs' opinion regarding Chase without any factual support." (ECF No 4 at 13) (citing *Basham v. General Shale*, 377 S.E.2d 830, 836 (W. Va. 1988) (where petitioners do no more than express their *opinion* that the respondent fraudulently sold a defective product, the court cannot find that they have stated a cause of action sufficient under Rule 9(b)). As further noted by Chase:

> Many more of Plaintiffs' fraud-type allegations asserted elsewhere in the Amended Complaint do not even pertain to Plaintiffs or their mortgage, but rather allege a wild global scheme without any elucidation regarding how said scheme involved Plaintiffs personally (all of which Chase specifically denies). (*See* Am. Compl., pp. 5, 8-10). Indeed, what is notably missing from Plaintiffs' Amended Complaint is an explanation of how Plaintiffs in particular have been victims of Chase's purported fraud with regard to the specific Loan at issue in this action.

(ECF No. 4 at 13).

To the extent that the plaintiffs have made "global, fraud-type allegations" concerning the act of "bundling mortgages" and "securitizing loans," Chase's Memorandum of Law states as follows:

> Several court have considered the theory that securitization of a loan renders the note "unsecured" and the deed of trust unenforceable, and those courts have found such theory to be without any legal basis. *See, e.g., Wittenberg v. Wells Fargo Bank, NA*, 852 F. Supp.2d 731, 751 (N.D. W. Va. 2012) (rejecting borrower's argument that securitization of her loan rendered her note unenforceable); *Coleman v. Bank of New York Mellon*, 2013 WL 1187158 *4 (N.D. Tex. Mar. 4, 2013) (same); *Taylor v. Ocwen Loan Servicing, LLC*, 2014 WL 280399, *6 (N.D. Miss, Jan. 24, 2014) (same); *Suss v. JP Morgan Chase Bank, NA*, 2010 WL 2733097, *5 (D. Md., Jul. 9, 2010) (same); *Frazier v. Aegis Wholesale Corp.*, 2011 WL 6303391, *4 (N.D. Cal., Dec. 16, 2011) (holding that securitization of borrower's loan had no effect on ability of lender's nominee to foreclose or transfer); *Upperman v. Deutsche Bank Nat'l Trust Co.*, 2010 WL 1610414, *3 (E.D. Va., Apr. 16, 2010) (finding no authority that the mere existence of pooling or servicing agreement or investment trust can relieve borrowers of obligation to perform under note and deed of trust, and holding that even if note was securitized, borrowers' claim that

14

securitization rendered note and deed of trust unenforceable was legally flawed).

(ECF No. 4 at 14 n.2).  Chase further asserts that any such allegations do not relate to the plaintiffs' mortgage and, thus, the plaintiffs cannot demonstrate that "(1) the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; (3) that *plaintiff* relied upon it and was justified under the circumstances in relying upon it."  (*Id.* at 14) (Citations omitted).

Chase also asserts that TARP and CPP are government programs which do not give rise to independent private causes of action.  Chase further asserts that the plaintiffs' reference to these programs appears to be "merely as a conduit for Plaintiffs' global, fraud-type allegations discussed above . . . ." and the plaintiffs have not specified how they were allegedly harmed in relation to these programs.  (ECF No. 4 at 15).

Chase also addresses the plaintiffs' count entitled "Good Faith" as an extension of their attempted "global fraud-type" claims, essentially equating that section of the Amended Complaint to assert a breach of the implied covenant of good faith and fair dealing.  (ECF No. 4 at 15 n.3).  Chase further notes, however, that West Virginia does not recognize a cause of action for a breach of the covenant of good faith and fair dealing independent of an express breach of contract claim, and, as addressed further below, Chase contends that the plaintiffs have not sufficiently pled such a claim.  (*Id.*)

Chase's Memorandum of Law further contends as follows:

> Under their count labeled "Anticipatory Repudiation," Plaintiffs assert that they entered into a mutual assent, and a willingness and eagerness to be bound, through the instruments of a contract, which took the form of a promissory note, a mortgage instrument, and more."  (Am. Compl., p. 11).  Plaintiffs go on to allege that the mortgage was "set-up deliberately to fail," that Chase "fail[ed] to deliver a valid mortgage," that "the mortgage was void," and that Chase "fail[ed] to grant a modification."  (*Id.*)  These allegations are related to Plaintiffs' assertion, not in a specific

15

count, but generally in the Conclusion of the Amended Complaint, that "Chase is in total violation of breach of contract." (*Id.* at 15).

Reading these statements together, it appears Plaintiffs intend to bring a breach of contract claim. However, Plaintiffs have wholly failed to set out the elements of a breach of contract action or any actual factual content in support thereof. *See Fass v. Nowsco Well Service, Ltd.*, 350 S.E.2d 562, 563 (W. Va. 1986) (complaint must set forth enough information to outline the elements of a claim or permit inferences to be drawn that these elements exist). "In West Virginia, the elements of breach of contract are (1) a contract exists between the parties; (2) a defendant failed to comply with a term in the contract; and (3) damage arose from the breach." *Wittenberg v. Wells Fargo Bank, NA*, 852 F. Supp.2d 731, 749 [(N.D. W. Va. 2012)] (citing *Wince v. Easterbrooke Cellular, Corp.*, 681 F. Supp. 2d 688, 693 (N.D. W. Va. 2010)). The Amended Complaint fails to allege factual content showing how Chase failed to comply with a specific term or condition of the Loan and/or Deed of Trust, and does nothing other than lodge vague legal conclusions that the mortgage was void. * * *

Additionally, the allegation that Chase "fail[ed] to grant a modification" is also not sufficient to support a breach of contract claim where the contracts at issue did not require Chase to grant such a loan modification. *See Wittenberg*, 852 F. Supp.2d at 749 (plaintiff failed to show that defendant breached Special Forbearance Agreement ("SFA") by not granting loan modification where defendant, under SFA, was permitted to institute foreclosure proceedings and was under no obligation to enter into any further agreement); *see also Corder v. Countrywide Home Loans, Inc.*, 2011 WL 289343, *3 (S.D. W. Va., Jan. 26, 2011) (breach of contract claim failed as a matter of law where: (1) plaintiff failed to specify any contractual provision violated by defendant; and (2) Deed of Trust at issue gave defendant unqualified right to foreclose in event of default and did not require defendant to pursue alternative remedies before seeking foreclosure).

Similarly, here, both the Deed of Trust and the Loan grant Chase the unqualified right to institute foreclosure proceedings.

(ECF No. 4 at 16-17). Chase's Memorandum of Law cites specific language from the mortgage documents, including a provision with permissive language stating that "Lender *may* modify this loan without the consent of or notice to anyone other than the party with whom the modification is made." (*Id.* at 17-18).

The plaintiffs' Objection to Chase's Motion to Dismiss contends as follows:

> The Plaintiffs have earlier provided the [sic] all the parties and the Court with sufficient information to draw a conclusion.  The Plaintiffs have claimed that when the U.S. Treasury withdrew 700-billion dollars from circulation, with other money's [sic; monies] too, that the effect was to place the rank and file, the low to middle-income wage earner, at a loss. Some lost there [sic; their] employment immediately, others lost employment most recently and yet we even at this time have not resumed employment.  The aforementioned is somewhat ludicrous, as we all know what has happened.

(ECF No. 9 at 1).

The Objection further appears to contend that Chase engaged in anticipatory repudiation of the contract because "Chase possessed advanced information to anticipate the demise of the Wiggin's [sic; Wiggins].  Chase new [sic; knew] in advance of the mortgage and the promissory note that the Wiggin's [sic; Wiggins] would fail at their attempts to stay current in there [sic; their] mortgage and the promissory note." (*Id.* at 3).  Thus, despite voluntarily agreeing to all of the terms of the mortgage, the plaintiffs now assert that "[t]he mortgage and the promissory note were placed upon [them] with deceit in that it was impossible to meet the terms of the mortgage and the promissory note."  (*Id.*)  The plaintiffs further contend that their obligation to pay should have been excused by a change in their circumstances, which, the plaintiffs claim, rendered their performance "impossible."  (*Id.*)

Chase's Reply brief asserts that the plaintiffs' Objection lodges additional allegations of a "wild, global conspiracy" and that such allegations are unsubstantiated and have no relation to the mortgage contract between Chase and the plaintiffs.  The Reply further states:

> Plaintiffs argue in their [Objection] that their performance under the mortgage should be excused under the doctrine of anticipatory repudiation because some unexpected event occurred rendering Plaintiffs'

performance impossible.  (*See* Pls.' Obj. at pp. 3-4).  In an attempt to fashion such an unexpected event, Plaintiffs string together a number of unrelated and unsubstantiated acts allegedly taken by the U.S. Treasury, the Federal Reserve, Chase and the Plaintiffs' employers, which allegedly purposefully [FN 1] combined to result in "catastrophic economic loss" for Plaintiffs (i.e. Plaintiffs' default under their mortgage).  (*See id.* at p. 3).  Even more wildly, Plaintiffs maintain that Chase engaged in the foregoing scheme with its sights set intentionally on Plaintiffs  - that is, they assert that Chase knew in advance of the mortgage and promissory note that Plaintiffs would default on it.  However, Plaintiffs provide no factual basis to support this alleged "deceit."  (*See id.*)

[FN 1 – At one point in their Objection, Plaintiffs accused a "powerful group" vaguely referred to only as "they," of acting "scientifically, systematically, with an evil diabolical plan."  (*See* Pls.' Obj. at p. 2).]

In reality, perhaps the safest conclusion to be drawn from Plaintiffs' imaginative pleadings is that Plaintiffs lost one or more jobs in a bad economy.  Their plight, though unfortunate, is not uncommon.  If every person who has endured some form of hardship in a bad economy was permitted to breach their contracts or default on their loans, free houses (and other financial assets) would rain from the sky.  Obviously, that is neither a fair nor a legally proper result.

The fact remains that Plaintiffs' overly broad, global, conspiracy-theory-type allegations do not establish any direct interaction between Chase and Plaintiffs and do not pertain to the contract at issue, *i.e.* Plaintiffs' mortgage and promissory note.

(ECF No. 13 at 1-2).

On May 8, 2014, the plaintiffs filed an unauthorized Sur-Reply to Chase's Motion to Dismiss (ECF No. 17).  The Sur-Reply attempts to bolster the plaintiffs' assertions that, as a result of the national financial crisis, and the alleged "$700-billion fraud" engaged in by the financial institutions who accepted the TARP and CPP money, "Chase knew that all contract-mortgage closing documents by lenders were at risk, no matter the financial base of the borrower's [sic; borrowers]."  (*Id.* at 2-3).  The plaintiffs again contend that Chase, nevertheless, "set (us) the Wiggins up deliberately and intentionally for default and foreclosure."  (*Id.* at 2).  The plaintiffs further repeat their assertions that

Chase engaged in "anticipatory repudiation" through a fraudulent scheme to impair the plaintiffs' "right of obligation to contract" under Article I, Section 10 of the Constitution, and that "[o]nce the 700-billion was put in place to the bank(s) (Chase) simply waited the time necessary for the economic cycle to follow and they would pick up the property in due course." (*Id.* at 3). The plaintiffs' Sur-Reply further asserts that these issues deserve to be decided by a jury.

Essentially, it appears that the plaintiffs are arguing that, as a result of the allocation of TARP funding to banks and other financial entities, including Chase, the financial circumstances of many low to middle-class Americans, such as the plaintiffs, changed, and consequently, Mr. and/or Mrs. Wiggins lost employment and could not pay their mortgage, and that Chase knew that this would happen when they entered into the plaintiffs' mortgage agreement. This is a fanciful and convoluted argument. Nevertheless, even taking these allegations as true, the plaintiffs have not set forth sufficient facts to establish any sort of fraud, breach of contract, or anticipatory repudiation by Chase concerning their mortgage contract with the plaintiffs.

Based upon the specific facts presented, the plaintiffs voluntarily entered into a mortgage agreement with Chase in which the mortgage documents provided for Chase's right to institute a foreclosure sale upon any default by the plaintiffs, and which contained permissive language concerning the ability to modify the terms of the mortgage agreement. The facts as alleged in the plaintiffs' Amended Complaint simply demonstrate that Chase complied with the terms of the mortgage contract by instituting the foreclosure and that Chase acted within its rights when it declined to issue a modification of the terms of the mortgage. Thus, the plaintiffs have not presented "enough facts to state a claim to relief that is plausible on its face." Accordingly, the

19

undersigned proposes that the presiding District Judge **FIND** that the plaintiffs' Amended Complaint fails to state any claim upon which relief may be granted with respect to defendant JP Morgan Chase Bank, N.A.

### B. Seneca's Motion to Dismiss and the plaintiff's Motion for Summary Judgment.

Seneca's Motion to Dismiss (ECF No. 5) and Memorandum of Law in support thereof (ECF No. 6) first assert that the plaintiffs' allegations concerning violations of their federal constitutional rights and their claims of anticipatory repudiation "have nothing whatsoever to do with Seneca's limited role of Trustee in this case." Accordingly, Seneca asserts that the plaintiffs have failed to state a claim showing an entitlement to relief under the pleading standards set forth in *Twombly* and *Iqbal, supra*. (ECF No. 6 at 2).

Seneca's Memorandum of Law further asserts that the plaintiffs have not pled sufficient facts to demonstrate that Seneca violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692. Seneca asserts that it complied with the applicable West Virginia law governing the roles and duties of a Trustee, and with the terms in the specific mortgage instruments executed by the parties. (ECF No. 6 at 3-4).

Specifically, Seneca claims that it complied with the requirements of West Virginia Code § 38-1-1 *et seq.*, which outline the limited duties of a trustee. In *Lucas v. Fairbanks Capital Corp.*, 618 S.E.2d 488 (W. Va. 2005), the Supreme Court of Appeals of West Virginia (the "SCAWV") examined these statutory provisions in relation to whether a trustee has a duty to determine the amount of debt owed, and whether the trustee must consider any objections from the trust grantor/homeowner before proceeding to a foreclosure sale. The SCAWV found as follows:

[W]e believe it may be readily inferred that the legislative purpose for allowing trustee foreclosure is to provide a more time efficient and economical method of foreclosure.  Having made this acknowledgement, we are reluctant to accept the Lucases' invitation to interpret W. Va. Code § 38-1-3 in a manner that complicates the trustee foreclosure process, as such a construction would be contrary to the legislative intent of the statute.

Turning to the specific statute at issue in this case, we look to its language in search of support for the Lucases' theory of requiring a trustee to ascertain the amount of debt prior to foreclosure.  We find none.  Rather, the duties of a trustee set out in the statute are rather sparse.  First, the trustee must receive a communication from a creditor or surety indemnified by the deed that the debt has become due, a default has occurred, and that a foreclosure sale is demanded . . . . The statute does, however, go on to additionally direct that, prior to a trustee sale at public auction, "all other conditions precedent to sale by the trustee, as expressed in the trust deed, shall have happened." W. Va. Code § 38–1–3.  Thus, if a requirement for ascertaining the amount of debt was included in the trust deed itself, the trustee would be required to comply therewith.  Absent such a specific requirement in the trust deed, however, there is simply no authority that would compel the trustee to make such a determination.

\* \* \*

We similarly disagree with the Lucases' contention that the fiduciary duty of the trustee to both parties of a deed of trust includes the duty to consider legitimate objections of the grantor/homeowner to a foreclosure sale.  Based upon the same principles of statutory construction discussed above, we find nothing in the language of W. Va. Code § 38–1–3 to suggest that a trustee has a duty to consider objections to the foreclosure sale.

\* \* \*

To the contrary, we previously have observed that a trustee does not have the power to resolve disputes between the grantor and grantee. In *Villers v. Wilson*, we stated that "[a] trust deed sale is normally conducted by a private individual, not a court.  The trustee has limited powers, which do not include the power to resolve controversies over debts owed by the secured creditor to the debtor." 172 W.Va. 111, 115, 304 S.E.2d 16, 19 (1983) (emphasis added) (citations omitted).

Instead, where the trust grantor wishes to challenge a foreclosure, the proper remedy is for the grantor to seek an injunction or to file an action to have the foreclosure sale set aside:

[T]he lending institutions of this state have operated under the current trustee foreclosure scheme since the founding of

> this state. This scheme has always permitted a grantor to seek an independent action to either prevent a real property foreclosure from taking place, or to have a real property foreclosure sale set aside.

*Fayette County Nat'l Bank v. Lilly*, 199 W.Va. 349, 357, 484 S.E.2d 232, 240. *See also Dennison v. Jack*, 172 W.Va. 147, 157, 304 S.E.2d 300, 310 (1983) ("The grantor of a trust deed may seek a court injunction against a proposed trust deed foreclosure sale"), *Wood v. The West Virginia Mortgage & Discount Corporation*, 99 W.Va. 117, 127 S.E. 917 (1925), *cf. Villers v. Wilson*, 172 W.Va. 111, 304 S.E.2d 16, (1983), or subsequent to a foreclosure sale, such a grantor may seek to have that sale set aside. *Moore v. Hamilton*, 151 W.Va. 784, 792, 155 S.E.2d 877, 882 (1967); Syl. pt. 2, *Corrothers v. Harris,* 23 W.Va. 177 (1883). In *Moore* and *Corrothers*, this Court stated that a sale under a trust deed will not be set aside unless for 'weighty reasons.' "). Thus it is for a court, and not the trustee, to address objections of the grantor/homeowner to a foreclosure sale.

> In accordance with the foregoing analysis, we now hold that the trustee in a trust deed given as security in connection with a home mortgage loan may not consider a trust grantor's objections to the foreclosure sale. Instead, where the trust grantor wishes to challenge a foreclosure, the proper remedy is for the grantor to seek an injunction or to file an action to have the foreclosure sale set aside.

618 S.E.2d at 495-498.

> Seneca's Memorandum of Law cites the *Lucas* decision and emphasizes that:

> West Virginia federal district courts have relied on *Lucas* in: (1) limiting the trustee's duties; and (2) refusing to "complicate the foreclosure process." *See Wittenberg v. Wells Fargo Bank, NA*, 852 F. Supp. 2d 731 (N.D. W. Va. 2012) (trustee not required to review account records to confirm amount due); *Spoor v. PHH Mortgage Corp.*, 2011 WL 883666 (N.D. W. Va.) (trustee not required to avoid foreclosure); *Patrick v. Teays Valley Trustees, LLC*, 2012 WL 5993163 (N.D. W. Va. (trustee not required to resolve debt dispute). *See also Petty v. Countrywide Home Loans, Inc.*, 2013 WL 1837932, *8 (S.D. W. Va. (deed of trust and statutes limit duties).

> Here, Seneca complied with the requirements of West Virginia Code § 38-1-1 *et seq.* and the actual contractual documents – the Note and Deed of Trust.

(ECF No. 6 at 3-4).   Seneca further asserts that the plaintiffs suffered no damages because the foreclosure sale was canceled in light of the plaintiffs' filing of suit in the Circuit Court of Logan County, and the plaintiffs remained in their home.  (*Id.* at 4).

In conjunction with their Response/Objection to Seneca's Motion to Dismiss (ECF No. 7-1). the plaintiffs filed a Motion for Summary Judgment (ECF No. 7-2) addressing their FDCPA claim.  The plaintiffs assert that Seneca is a "collection agency" as defined in West Virginia Code § 47-16-2(b), and that Seneca's conduct in relation to the foreclosure proceedings on the plaintiffs' house violated the FDCPA, specifically 15 U.S.C. § 1692(g)(a)(4).[1]  The plaintiffs assert that, upon being notified that the plaintiffs disputed their debt, Seneca failed to provide them with validation as to the legality and amount of the debt, and the name and address of the original creditor, as required by section 1692g.  The plaintiffs further assert that "Seneca intentionally and systematically presented false and misleading information that placed the Plaintiffs in belief that they were not subject to Article I, Section 10 of the U.S. Constitution."  (ECF No. 7 at 2).

The plaintiffs also filed a Memorandum of Law in support of their Objection and Motion for Summary Judgment (ECF No. 8).  The Memorandum of Law asserts that "Seneca is not the original creditor, but a third party unlawfully attempting to collect under the assignment and/or purchase money agreement."  (*Id.* at 2).  The plaintiffs contend that Seneca's failure to provide them with the name of the original creditor, the account numbers and a description of and the amount of the debt, with payment, violated 15 U.S.C. § 1692g(a)(4).  (*Id.*)

---

[1]  The undersigned notes that the plaintiffs are mixing issues of federal and state law.  The undersigned further notes that West Virginia Code § 47-16-1 *et seq.* (known as the "Collection Agency Act of 1973) governs the licensing, bonding and record keeping requirements for collection agencies in West Virginia. The penalty for failing to comply with these requirements is conviction of a misdemeanor and a maximum fine of $1,000.  The only private right of action permitted by the Collection Agency Act appears to be for the failure of a licensed agency to account and pay as set forth in the required bond.

The plaintiffs further attempt to draw Seneca into their "fraud" and "breach of contract" allegations by claiming that "Seneca engaged in the promotion [sic; of?] a diabolical, scheming plan, through the attempted collection of an original contract (mortgage and promissory note) that was seriously impaired.  The contract consisting of a mortgage and a promissory note was impaired by fraud, in such a manner to deny the Wiggins the natural order of an obligation of a contract." (*Id.*)

Seneca's Reply asserts that the plaintiffs have failed to address the sufficiency of their Amended Complaint against Seneca, and "merely rehash their disdain for the mortgage industry, cite irrelevant portions of the United States Constitution, and lament the current state of the economy.  These assertions cannot sustain their Amended Complaint, and it should be dismissed." (ECF No. 12 at 1).  Seneca emphasizes that the Amended Complaint did not provide any factual support beyond the naked assertion that Seneca violated the FDCPA, which falls woefully short of the pleading requirements of *Twombly* and *Iqbal.*  Seneca further asserts that the plaintiffs' attempts to bolster this claim with the additional conclusory allegations made in their Motion for Summary Judgment (ECF No. 7-2) and Memorandum in Support thereof (ECF No. 8) are also insufficient to allow this claim to proceed, and that such deficiencies cannot be excused by the plaintiffs' *pro se* status.  (ECF No. 12 at 2).

Finally, Seneca asserts that it merely acted in the capacity of a trustee relating to the foreclosure sale, which did not take place as a result of the instant lawsuit.  Seneca notes that, "[e]ven according the most liberal interpretation to the Complaint, the allegations set forth therein fail to allege a breach of any duty which would sustain a cause of action against Seneca." (*Id.*)

24

Seneca also filed a separate Response to the plaintiff's Motion for Summary Judgment (ECF No. 15), which largely repeats the arguments made in their Memorandum of Law in support of their Motion to Dismiss (ECF No. 6) and their Reply (ECF No. 12). Seneca also asserts that the plaintiffs' Motion for Summary Judgment is premature, to the extent that, if the court does not grant Seneca's Motion to Dismiss, there are genuine issues of material fact still in dispute and the parties should be entitled to conduct discovery on those issues before summary judgment may be appropriate. (ECF No. 15 at 1-4).

On May 8, 2014, the plaintiffs filed a document that is essentially both an unauthorized Sur-Reply to Seneca's Motion to Dismiss and a Reply to their Motion for Summary Judgment (ECF No. 18). Because the plaintiffs are permitted by the Local Rules of Civil Procedure to file a Reply to their Motion for Summary Judgment, the court has accepted and reviewed this document, which, again, repeats their assertions that Seneca is a "debt collector" that had a duty under 15 U.S.C. § 1692g to provide the plaintiffs with certain requested information about their alleged debt within a specific time period. (*Id.* at 3-4). This document again asserts that these issues deserve consideration by a jury, and contains a jury demand.

The plaintiff's Reply further asserts that, as a West Virginia corporation, Seneca "was and is very much a part of the program to continue in whatever manner to defraud the Wiggin's [sic; Wiggins] of money and our property. Seneca determined to be a part of the global JP Morgan Chase Bank, NA scheme . . . ." (*Id.* at 6). Thus, the plaintiffs are essentially rehashing their assertions that these private corporations were somehow engaged in a fraudulent scheme to deny the plaintiffs their "right of obligation to contract" under Article I, Section 10 of the United States Constitution, and to take their

property in violation of their constitutional rights under the Fourth, Fifth and Fourteenth Amendments.  Because neither Chase, nor Seneca, was acting under color of state law, these allegations were, previously herein, found to be legally insufficient, and will not be further addressed.

Furthermore, the role of a trustee in a mortgage foreclosure is set forth in West Virginia Code § 38-1-1 *et seq.*  The plaintiffs' argument that Seneca, the substitute trustee in this matter, was acting as a "collection agency" and, as such, had specific duties to disclose information about the debt to the plaintiffs, is belied by the SCAWV decision in *Lucas*, which interpreted those state statutes as not conferring a duty upon a trustee to ascertain and disclose information about the debt or to resolve any disputes or objections to the foreclosure by the debtor.  Thus, the undersigned proposes that the presiding District Judge **FIND** that the plaintiffs have not established that Seneca violated the FDCPA, specifically 15 U.S.C. § 1692g(a)(4).

## PROPOSED FINDINGS AND RECOMMENDATIONS

For the reasons stated herein, the undersigned proposes that the presiding District Judge **FIND** that the plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted against either defendant.  The undersigned further proposes that the presiding District Judge **FIND** that the plaintiffs are not entitled to judgment as a matter of law on their FDCPA claim against Seneca.  Thus, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the Motions to Dismiss filed by JP Morgan Chase Bank, NA and Seneca Trustees, Inc. (ECF Nos. 3 and 5) and **DENY** the plaintiffs' Motion for Summary Judgment (ECF No. 7-2).

The parties are notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin,

United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b)(2), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service), from the date of filing this "Proposed Findings and Recommendation" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendation" to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).   Copies of such objections shall be served on Judge Goodwin.

The Clerk is directed to file this "Proposed Findings and Recommendation," to mail a copy of the same to plaintiffs and to transmit a copy to counsel of record.

January 20, 2015

Dwane L. Tinsley
United States Magistrate Judge

27